**Lisa B. HOGAN, Plaintiff,**

v.

**BELLSOUTH CORPORATION, and BellSouth Telecommunications, Inc., Defendants.**

**No. 1:01–CV–1322–RWS.**

United States District Court,
N.D. Georgia,
Atlanta Division.

July 29, 2004.

Charles Ronald Bridgers, Delong Caldwell Novotny & Bridgers, Edmund J. Novotny, Baker, Donelson, Bearman, Caldwell & Berkowitz, Lisa Y. Smith, Office of Lisa Young Smith, Suzanne K. Lehman, Elarbee Thompson Sapp & Wilson, Atlanta, GA, for Plaintiff.

James H. Coil, III, Robert Kendall Haderlein, Kilpatrick Stockton, Atlanta, GA, for Defendants.

### ORDER

STORY, District Judge.

Plaintiff Lisa B. Hogan filed this employment discrimination suit against Defendants BellSouth Corporation and BellSouth Telecommunications, Inc. Now before the Court for consideration is the Report and Recommendation ("R & R") of Magistrate Judge Gerrilyn G. Brill [58–1], recommending that Defendants' Motion for Summary Judgment [31–1] be granted. Also pending are Plaintiff's Motions for Extensions of Time [59–1 & 64–1], Plaintiff's Motion to Apply Adverse Inference Doctrine [63–1], Motion to Compel [63–2], or Motion Pursuant to Rule 56(f) [63–3], and Defendants' Motion for Leave to File Surreply [69–1]. Having considered the entire record, the Court enters the following Order.

As initial matters, the following Motions are hereby **GRANTED** for good cause shown: Plaintiff's Motions for Extension of Time [59–1 & 64–1], and Defendant's Motion for Leave to File Surreply [69–1].

### Discussion

#### I. Plaintiff's Motion to Apply Adverse Inference Doctrine

■ Plaintiff contends that Defendants did not produce certain discovery materials and she moves the Court to apply the adverse inference doctrine and construe Defendants' failure to produce against them. A review of the history of the party's discovery disputes reveals that Plaintiff's Motion is untimely and therefore due to be denied. Even if the Motion were not untimely, however, the Court concludes that the adverse inference doctrine is not warranted here.

Discovery in this case closed on September 16, 2002. On September 30, 2002, Plaintiff requested an extension of time within which to file an anticipated motion to compel. On October 10, 2002, Plaintiff again requested an extension of time, until ten days after the parties conducted mediation. In an Order entered May 23, 2003, Judge Brill explained that the parties had delayed too long in pursuing mediation. Judge Brill therefore set a summary judgment briefing schedule but allowed Plain-

tiff twenty days within which to file a motion to compel. Plaintiff filed her Motion to Compel [29–1] on June 11, 2003. Shortly thereafter, on June 24, 2003, BST filed its Motion for Summary Judgment [31–1]. Plaintiff requested an extension of time within which to file her response to the summary judgment motion until after the Court had ruled on her Motion to Compel.

Judge Brill held a hearing on October 2, 2003, at which she apparently gave the parties some indication of her opinions regarding the Motion to Compel but admonished the parties that they should attempt to resolve the discovery dispute themselves. The parties thereafter represented to the Court that they had resolved their dispute; Judge Brill entered an Order denying Plaintiff's Motion to Compel as moot on December 4, 2003. In the same Order, Judge Brill ordered Plaintiff to submit her Response to Defendants' Motion for Summary Judgment within twenty days.

Five days after Judge Brill's December 4, 2003 Order, Plaintiff received documents from Defendants pursuant to the agreement they had reached. Although she now contends that that production did not meet the terms of the parties' agreement, she made no attempt to notify the Court that the productions was unsatisfactory until *after* Judge Brill issued her R & R on January 28, 2004. Indeed, she did not raise the issue at all until February 23,

2004, when she filed her Corrected Objections to the R & R and mentioned that she would be filing her Motion to Apply Adverse Inference Doctrine.

Plaintiff's objections to the allegedly deficient production come too late. She had ten days within which to file an objection to Judge Brill's December 4, 2003 Order denying her Motion to Compel as moot, but she failed to file any objections. *See* Fed.R.Civ.P. 72(a) (setting forth time limits for serving objections to nondispositive magistrate orders). She might also have filed a motion for reconsideration within ten days of the December 4, 2003 Order, but she did not do so. Finally, she could have raised the issue along with her response to Defendants' Motion for Summary Judgment by filing an affidavit pursuant to Federal Rule of Civil Procedure 56(f), but she did not do so.[1] Plaintiff cannot attempt to obtain more evidence after learning of the Magistrate Judge's summary judgment recommendation; her current Motion simply comes too late and is therefore due to be denied.[2]

In the alternative, the Court finds no circumstances warranting application of the adverse inference doctrine. In the Eleventh Circuit, an adverse inference is drawn from a party's failure to preserve evidence only when there is a showing of bad faith. *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1294 (11th Cir.2003); *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir.1997); *Cooper v. Southern*

---

1. Plaintiff did note, in footnote 13 of her Response to Defendants' Motion for Summary Judgment [46–1], that "BST has purportedly 'lost' and therefore not produced all of the personnel records of its attorney-employees .... This failure clearly hinders Ms. Hogan's ability to show which of her peers may be adequate comparators." In the footnote, Plaintiff argued that because BST has failed to produce these records, the Court should draw an adverse inference. This argument falls far short of being a Rule 56(f) affidavit or

even a notification to the Court that the Motion to Compel was no longer moot. Moreover, the R & R addresses this argument and it therefore appears that the Motion to Apply Adverse Inference Doctrine is an improper motion.

2. For these same reasons, the Court finds that Plaintiff's Motion to Compel and Motion Pursuant to Rule 56(f) are untimely and due to be denied.

*Co.*, 260 F.Supp.2d 1258, 1275 (N.D.Ga. 2003). The loss or destruction of records through mere negligence is not enough to support an adverse inference because it does not sustain an inference of consciousness of a weak case. *Bashir*, 119 F.3d at 931. Instead, bad faith essentially requires that a party "tampered with the evidence." *Id.*

Here, Defendants have produced evidence showing that their production was responsive to the Plaintiff's request as modified by the parties' agreement following the October 2, 2003 hearing before Judge Brill. If Plaintiff believed the parties' agreement did not cover all of the production she sought, she should not have represented to the Court that the issues in her Motion to Compel were resolved. Moreover, Plaintiff has failed to show any evidence of Defendants' bad faith. Plaintiff contends that Defendants have failed to maintain certain records in violation of federal statutes, but there is no showing, consistent with Eleventh Circuit requirements, that that failure was premised on any desire to tamper with evidence. Accordingly, Plaintiff's Motion to Apply Adverse Inference Doctrine [63–1], Motion to Compel [63–2], and Motion Pursuant to Rule 56(f) [63–3] are hereby **DENIED**.

## II. R & R

In the R & R, Judge Brill recommends granting Defendants' Motion for Summary Judgment. Having carefully considered all the documents and evidence related thereto, the Court accepts the R & R and hereby adopts it as the Order of the Court, with the following additions. First, the Court holds that even if Plaintiff had established a prima facie case of race or sex discrimination in her termination, the legitimate, non-discriminatory reasons proffered for Defendants' failure to promote her, coupled with her unwillingness to participate in the weekly feedback process Defendants developed for her, constitute

legitimate, non-discriminatory reasons for her termination. Moreover, for the same reasons described in the R & R regarding Plaintiff's failure-to-promote claim, Plaintiff has failed to show evidence that the reasons supplied for her termination are pretextual. *See Holifield v. Reno*, 115 F.3d 1555, 1564–65 (11th Cir.1997) (discussing and applying standards; "[t]he inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance").

Second, the Court is mindful of Plaintiff's argument that Defendants wished to impose the weekly feedback process on her in retaliation for the complaints she raised in a September 1999 meeting with Morgan and Brown. Notwithstanding significant causation issues with this argument-Defendants have adduced evidence that the concept of the feedback program was developed prior to the September 1999 meeting-this theory cannot succeed because Defendants had a legitimate, non-discriminatory reason for establishing the weekly feedback process. That is, they were attempting to assist Plaintiff in resolving what they reasonably believed were deficiencies in her performance. Plaintiff has not shown evidence that this reason is pretextual. *See Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1075 n. 54 (11th Cir.1995) (per curiam) (even if a plaintiff establishes a prima facie retaliation claim, the *McDonnell Douglas* burden-shifting analysis can still bar the claim where the employer submits a legitimate, non-discriminatory reason and there is no evidence of pretext).

### Conclusion

BST's Motion for Summary Judgment [31–1] is hereby **GRANTED**. Plaintiff's Motions for Extensions of Time [59–1 & 64–1] are hereby **GRANTED**. Plaintiff's Motion to Apply Adverse Inference Doctrine [63–1], Motion to Compel [63–2], and

Motion Pursuant to Rule 56(f) [63–3] are hereby **DENIED**. Defendants' Motion for Leave to File Surreply [69–1] is hereby **GRANTED**.

### REPORT AND RECOMMENDATION AND ORDER

Plaintiff, Lisa Hogan, filed this employment discrimination action on May 23, 2001 against BellSouth Corporation ("BSC") and BellSouth Telecommunications ("BST") (collectively referred to as "BellSouth", "the company" or "defendant"). Plaintiff alleges that defendant is liable to her for (1) failing to promote her because of her race and sex, (2) terminating her because of her race and sex and in retaliation for protected activity, and (3) racial and sexual harassment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (race and sex) and 42 U.S.C. § 1981 (race). Defendant has moved for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure based upon the pleadings, statements of material fact, exhibits, and discovery materials submitted by the parties. For the reasons that follow, the undersigned **RECOMMENDS** that defendant's Motion for Summary Judgment [Doc. 31] be **GRANTED**.

This action is also before the court on defendant's Motion to File Expanded Reply Brief [Doc. 52]. For good cause shown, this motion is **GRANTED**.

### I. FACTUAL BACKGROUND [1]

Plaintiff, an African–American woman, began work on July 29, 1998 as an attorney in BST's Miami, Florida office, which provided legal services to BST's Florida operations. The legal department has two attorney classifications: "Pay Band LP" and "Pay Band LA." The Pay Band LP attorneys are the more senior attorneys and receive greater compensation than the Pay Band LA attorneys. Plaintiff was hired as a Pay Band LA attorney. Robert Sterrett, BST's Associate General Counsel, told plaintiff at the time she was hired that she would be promoted to the higher pay band in August 1999 if she achieved satisfactory results in her legal duties. (Pla.Dep. p. 206).

At the time plaintiff was hired, Robert Beatty was General Counsel for BST's Florida operations and Nancy White was Assistant General Counsel. In December 1998, several months after plaintiff's hire, White succeeded Beatty as General Counsel for BST–Florida.

During the first five months of plaintiff's employment, White received a number of complaints and negative comments about plaintiff's demeanor and performance from plaintiff's co-workers and company personnel whom plaintiff was assigned to serve. These complaints and comments were set forth in a performance evaluation that White prepared covering plaintiff's performance for the period from July 29, 1998 through December 21, 1998. (Appendix to Defs. Motion for Summary Judgment (hereinafter, "DApx"), No. 8). In her evaluation, Ms. White stated, "plaintiff's performance has been less than satisfactory. She has failed to perform to the level expected by this department and to that expected by her clients." Ms. White listed and elaborated on the following four areas in which she believed plaintiff was deficient:

1. "First and foremost," failure to establish satisfactory client relationships. White detailed conversations that she had with five company employees, managers, or directors who had given examples of their difficulties in dealing with plaintiff.

---

1. Unless otherwise indicated by citation to the record, the facts stated herein are not disput-
ed by the parties. Disputed facts are presented in a light most favorable to plaintiff.

Judy Spencer, a Manager in Corporate and External Affairs ("C & EA")—Brevard County, complained that plaintiff displayed a poor attitude and that she "found Ms. Hogan to be unresponsive, untimely, and unwilling to discuss matters with employees below a certain level." Ms. Spencer gave White a specific example and documentation to support her negative comments about plaintiff. Judy Childers, a C & EA Director, and Robert Seitz, a C & EA Manager, also expressed specific concerns about plaintiff's timeliness, attitude, and quality of legal representation. Frank Meiners, a Director of Regulatory and External Affairs, complained that plaintiff was caustic and inflexible, and he gave specific examples. John Farkas, a Specialist in Network Planning and Support Group, related that he found plaintiff to be less than a team player and that she had rejected his assistance in his area of expertise, telling him, in essence, to "butt out of legal" concerns.

White noted that plaintiff had received a letter of commendation from one client regarding the resolution of cable-damage incidents, but that the majority of the remaining clients with whom she had spoken were unwilling to commit to an opinion of plaintiff. In general, White concluded that defendant's clients found plaintiff to be "difficult to get along with, unresponsive, untimely and unwilling to listen."

2. Deficiencies in Judgment. In this area, White noted that plaintiff had been tardy to important meetings, had not attended at least one important meeting, and had not taken advantage of resources made available to her.

3. Deficiencies in legal knowledge, and analysis and problem solving. In these areas, White noted that plaintiff had relied upon the knowledge of others instead of making an independent examination of the facts and undertaking her own legal analysis. White believed that plaintiff's conduct had resulted in unnecessary outside counsel fees and client dissatisfaction.

4. Deficiencies in relationships with other attorneys and support staff. White noted that, on several occasions, she had intervened in disputes between plaintiff and other attorneys within the office. White observed that plaintiff had a tendency to order others around and to discuss things by memorandum rather than through face-to-face interactions. White gave several examples of plaintiff's conduct in this area.

White also noted that plaintiff had not exhibited sufficient work motivation, had a tendency to take sole credit for actions in which she merely played one role, and exhibited a tendency to argue rather than discuss or accept. White gave examples to support her conclusions.

In summary, White stated:

Ms. Hogan's performance for the past several months reflects serious concerns about her ability to remain in the Bell-South legal department without significant improvement. The legal department is a customer service organization. Based upon the feedback from clients and from personal observation, Ms. Hogan is not providing satisfactory customer service.

(DApx 8). White recommended to her supervisor, Sterrett, that plaintiff be terminated. (White Dep. p. 156).

White's Performance Evaluation was presented to plaintiff at a meeting on February 23, 1999, at which Sterrett was present. Plaintiff was surprised by the negative comments and argued that they were not justified. She contended that, in each instance, the person making the negative comment had been at fault and that she bore no responsibility for his or her dissatisfaction or criticism. Plaintiff later followed up with a written response in which

she reiterated her positions. (DApx 12).[2] The court will assume, for purposes of summary judgment, that plaintiff's version of each incident about which she has personal knowledge is correct. Plaintiff also expressed her opinion that she had "performed [her] legal responsibilities in a superior manner during [her] initial six months with BellSouth." *Id.*

Plaintiff does not dispute that the negative comments were made to White. She contends, however, that White intentionally did not interview, or failed to include in the evaluation, individuals who had complimented plaintiff's performance. (Pl. Aff.¶¶ 16–54). However, plaintiff presents no admissible evidence to support this assertion. Plaintiff gave White a list of employees/clients for White to contact. Plaintiff believed that the individuals on her list would provide objective comments. (Pl.Aff.¶ 17). Plaintiff presents no evidence from these individuals, and, more importantly, no evidence that White was aware of their compliments or intentionally failed to include any compliments in the evaluation.

Sterrett and BST General Counsel Jeffrey Brown believed that plaintiff should be given an opportunity to transfer to another BST location in lieu of termination. During the February 23rd meeting, Sterrett told plaintiff that there was an opening in the complex litigation department in Atlanta, and he asked whether plaintiff would be interested in that position. Sterrett suggested that the transfer to Atlanta could be a "fresh start" for plaintiff and that, if she refused the transfer, there would be no future for her with the company. (Pl.Aff.¶ 55). Plaintiff agreed to accept the transfer, and she began to work in the Atlanta office on April 15, 1999, under the supervision of

Fred Walters, BST's Senior Attorney for Litigation.

On April 1, 1999, while she was still working in Miami, plaintiff took part in a telephone conference with other BST personnel and Charles Vandiver, the General Counsel of the Florida Public Service Commission ("PSC"), the agency responsible for the regulation of telephone service in Florida. The call concerned a customer complaint that could have resulted in an informal hearing before the PSC. Plaintiff believed that Vandiver had given an incorrect legal opinion to BellSouth employees regarding BellSouth's refusal to give telephone service to customers with unpaid bills. (Pl.Dep. p. 290). During the telephone conversation, plaintiff asked Vandiver to cite legal authority for his position, but Vandiver declined to do so. Vandiver became hostile, made insulting remarks about BellSouth, and said that the BellSouth representatives were wasting his time. (Pl.Dep. p. 291). Plaintiff pressed Vandiver for the authority on his position. At one point, plaintiff told Vandiver "I thought we were going to have a professional discussion, but apparently we were not." Upon hearing plaintiff's comment, Vandiver responded that BellSouth should go forward with the informal hearing, and he abruptly hung up the telephone. (DApx 13).

White was alerted to the conversation by a letter from Cherry Cox, a company employee who had participated in the call. Cox told White that one of the BellSouth participants had called Vandiver back to apologize for the conversation and to accept his proposed resolution of the customer complaint. When Cox's letter was shared with plaintiff, she denied doing anything wrong. (Appendix filed with Pla.

---

**2.** Plaintiff's affidavit testimony also disputes, in detail, the criticisms contained within White's evaluation.

Resp. to Defs. Motion for Summary Judgment (hereinafter "PApx"), No. A–7). Plaintiff's response generated an e-mail to plaintiff from BST Associate General Counsel Douglas Lackey, suggesting that plaintiff needed to be more sensitive to her approach and use of words with individuals who held a position of authority over BellSouth. (DApx 14). Plaintiff never admitted the possibility that she had mishandled the situation. (Pl.Dep. pp. 296–297).

Walters, plaintiff's Atlanta supervisor, believed that plaintiff had performed adequately during her first few months in Atlanta. Walters complimented plaintiff's work, told her that she was on track for promotion and that he would be recommending her for promotion. He never gave her any indication that she would not be promoted to the higher pay band. (Pl. Aff.¶ 64).

However, after plaintiff's first few months in Atlanta, Walters began to observe deficiencies in plaintiff's performance. In general, he believed that plaintiff failed adequately to keep him informed, was difficult to locate, had poor peer relationships, had inadequate substantive knowledge of the law, and exercised poor judgment. (Walters Dep. pp. 74, 77–9, 88–118, 169). His biggest concern was plaintiff's inability to get along with others. (*Id.* p. 100). Plaintiff disputes all of Walters' criticisms of her performance.

In the fall of each year, BellSouth legal department officials decide which attorneys in Pay Band LA, if any, will be promoted to Pay Band LP. Company policy provides that, in order to become eligible for promotion, an attorney should have not less than eight years of professional experience, including at least three years in the BellSouth legal department. However, an attorney with not less than ten years of professional experience, including at least one year in the BellSouth legal department, is also eligible for consider-

ation to Pay Band LP. To receive a promotion, attorneys must also have, among other things, a record of professionalism, legal excellence, and skill with clients. Because plaintiff had nine years of legal experience prior to joining BellSouth, she became eligible for consideration for reclassification to Pay Band LP in July 1999, one year after she began her employment with the company.

It is not unusual for an attorney in Pay Band LA not to be selected for promotion in his or her first year of consideration. Of those who were eligible for promotion in the years from 1995 to 1998, every class had at least one candidate who was not selected. However, plaintiff was the only lawyer in her class who was eligible for promotion, but not promoted.

As part of the process for considering plaintiff for promotion, Walters spoke with a number of clients and fellow attorneys with whom plaintiff had worked in Florida and Atlanta. Fellow attorney Dorian Denberg provided Walters with a memorandum dated September 8, 1999, detailing problems she had experienced with plaintiff's work on rights-of-way matters in Florida. (Ex. D to Def. Reply). Walters had received other reports of dissatisfaction with plaintiff.

Plaintiff believes that Walters purposely sought out negative comments from plaintiff's clients and fellow attorneys and disregarded the positive comments that she had received. (Pla.Aff.¶ 67). However, she presents no admissible evidence to support this belief.

Based on Walters' conversations and his personal observations, he believed, and recommended to his superiors, that plaintiff not be promoted to Pay Band LP in 1999. General Counsel Charles Morgan and his senior leadership team reached the consensus that plaintiff should not be promoted because of deficiencies in her performance working with clients, her adver-

sarial nature, her unwillingness to take advice, and her unwillingness to work as part of a team. (Sterrett Dep. p. 66). Morgan was the ultimate decisionmaker.

Walters and Sterrett informed plaintiff of the company's decision on September 20, 1999. They told her that the incident with the Public Service Commission General Counsel was an example of her not getting along with clients, and that the decision not to promote her was based on comments from her peers and clients. (Pl. Dep. p. 289).

When plaintiff expressed her surprise at the decision, Sterrett told plaintiff that he had not wanted to hire plaintiff and attorney Alberto Pita.[3] According to plaintiff, Sterrett also told her that her culture precluded her advancement within the company. (Pl.Dep. pp. 287–288). Sterrett does not remember any comment about plaintiff's culture impeding her advancement, but states that any reference to "culture" would have been a reference to the culture of fine service and teamwork in the law department. (Sterrett Dep. p. 61).

Plaintiff met with Morgan and Brown on September 30, 1999 to further discuss the company's decision not to promote her. Plaintiff asked that the decision be reconsidered. Morgan and Brown agreed to reconsider the decision and to get back with her. Plaintiff told Brown and Morgan that she had been subjected to inappropriate conduct, such as innuendos about a sexual relationship with Morgan, insulting cartoons in the lunch room, the ripping down articles about diversity, and Sterrett's comments about plaintiff's culture and not wanting to hire herself and Pita. (Pla.Aff.¶ 77). On October 11, 1999, Sterrett and Brown informed plaintiff that the decision not to promote her would stand.

At one of the meetings discussing her non-promotion, Brown and Sterrett suggested the possibility of implementing an evaluation/feedback process with plaintiff. The process would have allowed plaintiff to select a mentor of her choice and would have required Walters to meet with plaintiff on a weekly basis to give her feedback and to discuss comments from the employees and co-workers with whom she worked. No other attorney in the office would have been subjected to this process. (Pla. Aff ¶ 83).

At the meeting, plaintiff stated that she was not ready to respond to this "disparate" evaluation process. During a later meeting, Walters outlined the evaluation process and said that plaintiff would be terminated if she did not agree to participate in the evaluation process. (Pla. Aff ¶¶ 80–81). Plaintiff had follow-up meetings with Sterrett and Walters regarding this process, and they gave plaintiff a deadline in December to make her decision. On December 2, 1999, plaintiff informed Walters that she believed the proposed process was discriminatory because it applied only to her, and she declined to participate in it. (Pla. Aff ¶ 85).

Sometime prior to February 8, 2000, Walters prepared a summary of the negative feedback he had received regarding plaintiff between July 28, 1998 and December 1999. (DApx 17). Plaintiff disputes that she is in anyway at fault for any of the complaints or criticisms leveled at her. (Pla.Aff.¶ 67–72). On February 8, 2000, Walters and Sterrett, with the approval of Brown and Morgan, presented plaintiff with her 1999 performance evaluation, which, after giving specific examples of deficient performance as well as positive attributes, concluded:

> It is only after hours of concentrated consideration that I must confess that I do not believe Lisa can succeed as a member of this department. The areas

---

**3.** Pita was General Counsel of BellSouth International Corporation.

where controversy swirls are the same as in Florida; yet Lisa does not and will not acknowledge any need for change. That failure of acknowledgment is fatal to her chances of success within the department. (DApx 28). Walters and Sterrett told plaintiff that she was being terminated because she refused to agree to participate in their proposed evaluation process. (Pla.Aff.¶ 86). Plaintiff's final day of employment with BST was March 1, 2000. Additional facts are discussed in context below.

## II. *SUMMARY JUDGMENT STANDARD*

Summary judgment should be granted where no genuine issue as to any material fact is present and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The movant carries its burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). The nonmovant is then required "to go beyond the pleadings" and to present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, "[t]he mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Resolving all doubts in favor of the non-moving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

## III. *DISCUSSION*

### A. *RACE AND SEX DISCRIMINATION*

Under Title VII, an employer may not discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of that individual race or sex. 42 U.S.C. § 2000e–2(a)(1).[4] In individual disparate treatment cases, such as this, plaintiffs bear the initial burden of establishing a prima facie case of discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Combs v. Plantation Patterns,* 106 F.3d 1519, 1527–28 (11th Cir. 1997), *cert. denied,* 522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). If a prima facie case is established, a legal presumption of unlawful discrimination arises and the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment action. *McDonnell Douglas,* 411 U.S. at 802–04, 93 S.Ct. 1817. If the employer does so, the presumption is eliminated, and the plaintiff must be given an opportunity to prove by a preponderance of the evidence that the legitimate reason offered by the defendant is a pretext for discrimination. *Id.* At all times, plaintiff

---

**4.** Section 1981 of Title 42, under which plaintiff also brings a race discrimination claim, states that "[a]ll persons ... shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens ...." 42 U.S.C. § 1981(a).

The same analysis is used to evaluate race discrimination claims brought pursuant § 1981 as is used for Title VII claims. *Crawford v. Western Elec. Co.,* 745 F.2d 1373, 1376 (11th Cir.1984).

retains the ultimate burden of persuading the finder of fact that the defendant acted with discriminatory intent. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

### 1. *Prima Facie Case of Discrimination*

■ A prima facie case of discrimination may be established either through direct evidence of discriminatory intent, or, as is more often the case, through circumstantial evidence capable of supporting an inference of intentional discrimination. *See Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 641–42 (11th Cir.1998). Plaintiff does not contend that she has direct evidence of discrimination. To establish a prima facie case using circumstantial evidence, plaintiff must produce evidence that (1) she was a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) evidence by which a finder of fact could reasonably conclude that her employer intended to discriminate on the basis of race and/or sex if the employer's actions were to remain unexplained. *See, e.g., Furnco Construction Corp. v. Waters,* 438 U.S. 567, 575–76, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). Depending on the circumstances of the particular case, the fourth element may require a showing that the plaintiff was replaced by an individual outside her protected class or that a similarly situated individual outside her protected class was treated more favorably. *See, e.g., Coutu v. Martin County Bd. of County Commr's,* 47 F.3d 1068, 1073 (11th Cir.1995); *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185 (11th Cir.1984).

■ Defendant concedes, for purposes of summary judgment, that plaintiff has established a prima facie case with respect to her claim of discriminatory (race and sex) failure to promote. However, defendant argues that plaintiff has not established a prima facie case of discriminatory termination.

Plaintiff argues that she does not have to present evidence of similarly situated comparators in order to establish a prima facie case that she was terminated because of her race or sex. Instead, she argues:

[H]ostility towards Morgan's diversity program held by Ms. Hogan's peers and some of her superiors—effectuated against Ms. Hogan through efforts to concoct misleading evaluations—constitute sufficient circumstantial evidence for a jury to infer that Ms. Hogan was discriminated against on the basis of her race and/or gender.

(Pla.Brf. p. 22). In support of this contention, plaintiff avers that, before she was hired, Morgan had undertaken an initiative to bring in qualified attorneys from diverse backgrounds. Morgan told plaintiff that his diversity program was not supported throughout the company and that he anticipated she would encounter racial obstacles. (Pla.Aff.¶¶ 6). Plaintiff, however, presents no evidence that any person involved with the decision to terminate her employment ever made a comment critical of the diversity initiative. Plaintiff's statements suggesting that people were hostile towards the company's diversity initiative are either hearsay, attributed to unidentified persons, or attributed to persons with no connection to the employment decisions at issue.[5] While it is generally true that a

---

**5.** Plaintiff states that shortly after she began working for the company, unidentified employees began making negative and derisive comments to her about the diversity efforts

and minority employees. On her first day of work, Donna Adkins, a paralegal told plaintiff that Morgan was a clown, his diversity efforts were a joke, and everyone called him "Chuck-

showing of similarly situated comparators is not the exclusive means of establishing a prima facie case of discrimination, plaintiff's evidence regarding alleged hostility towards the company's diversity program is an insufficient basis for a jury to infer discrimination in this case.

Plaintiff's testimony that Sterrett referred to plaintiff's "culture," when he told her that she would not be promoted, and said that he had not wanted to hire her and another minority attorney in the first place, is also insufficient by itself, or when considered together with the other evidence, to constitute a prima facie case of discriminatory termination.

Plaintiff also contends that she has presented evidence of similarly situated comparators outside of her protected class who were not terminated. On this point, plaintiff argues:

> Beatty told Hogan that all attorneys in the Miami office had been criticized by various employee/clients of BST at different times and got into arguments with the staff over personality conflicts. Beatty and Hank Anthony used to yell at each other down the hallway. Dorian Denberg, George Hanna and Fred Walters were well-known for arguing with people and witnessed by Ms. Hogan doing so.

In support of this argument, plaintiff cites "PRSMF No. 18." (Pla.Brf. p. 23). The undersigned has read Plaintiff's Response to Defendant's Statement of Material Facts No. 18 and does not find evidence therein to support the above-quoted argument. Even assuming that Beatty made

the general comment that is attributed to him, and plaintiff witnessed occasional arguments by other attorneys, that evidence is clearly insufficient to show that other attorneys, similarly situated to plaintiff, were treated more favorably. Plaintiff presents no evidence that defendant retained any other attorney with a similar record of client dissatisfaction and complaints or who rejected the company's plan to correct his or her perceived performance deficiencies. The Court of Appeals for the Eleventh Circuit requires "that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employer's reasonable decisions and confusing apples with oranges." *Maniccia v. Brown*, 171 F.3d 1364, 1368–69 (11th Cir.1999). Plaintiff's evidence falls far short of meeting this standard.

Finally, plaintiff asks the court to infer that similarly situated comparators exist because defendant did not produce, during discovery, all of the requested evaluations of its in-house attorneys. (Pla.Brf. p. 23, n. 13). Defendant states that it produced more than one hundred evaluations, but that some of the evaluations it had agreed to produce had been legitimately destroyed pursuant to its retention policy. (Def. Reply Brf. p. 7, n. 4). After reviewing the correspondence between the parties, the court finds no basis to infer any facts from defendant's failure to produce all evaluations for agreed-upon attorneys.

Accordingly, the court finds that plaintiff has not establish a prima facie case of race

---

les the Clown." Adkins also told plaintiff that she, and the rank and file within the legal department, did not support the diversity efforts because they believed it would lower the quality of the legal work. Plaintiff adds that Henry Walker made negative comments regarding the diversity efforts and that George Hanna, an attorney in the Miami office, also referred to Morgan as "Chuckles the Clown"

and cautioned plaintiff about speaking about the diversity efforts with others in the company. Finally, at a company-wide lawyers conference in Miami Beach, two unidentified lawyers opined in response to a presentation about the diversity initiative that bringing in women and minorities would reduce the quality of the legal department staff. (Pla.Aff.¶¶ 6, 8–9).

or sex discrimination with respect to her termination claim, but that she has established a prima facie case with respect to her promotion claim.

### 2. Defendant's Stated Reasons for Not Promoting Plaintiff

■ Once a prima facie case of discriminatory intent has been established, the burden of production shifts to defendant to articulate a legitimate, non-discriminatory reason for plaintiff's termination. *See McDonnell–Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. Defendant's burden is "exceedingly light" and is "one of production, not proof." *Perryman v. Johnson Prods. Co.,* 698 F.2d 1138, 1142 (11th Cir.1983).

Defendant summarizes its legitimate non-discriminatory reasons for not promoting plaintiff to Pay Band LP as follows:

> Plaintiff was not promoted to Pay Band LP because she had not demonstrated the record of professionalism, legal excellence and client skills necessary for elevation to the LP level. To the contrary, there were numerous work performance issues, including serious problems associated with her peer and client relationships, that precluded her from meeting the standard.

(Def.Brf. p. 13).

Plaintiff argues that defendant has failed to meet its burden of producing legitimate, non-discriminatory reasons because the reasons provided are impermissibly vague, fail to identify objective standards for measuring her performance, and are subjective. (Pla.Brf. p. 12). The court disagrees. Defendant has given plaintiff a large volume of detail to justify its decision not to promote her. White's evaluation of plaintiff's 1998 performance, given to plaintiff in February of 1999, contains allegations of plaintiff's unsatisfactory interactions with numerous named clients and coworkers as well as White's reasons for concluding that plaintiff was deficient in legal judgment, knowledge and problem solving. Plaintiff was also notified about defendant's dissatisfaction concerning her April 1999 telephone conference with the General Counsel for the PSC. In addition, Walters testified in detail, and provided contemporaneous notes regarding the reasons, regarding his recommendation that plaintiff not be promoted. (DApx 18,19).

Plaintiff's detailed written responses to her two performance evaluations, (PApx 1,13), as well as her detailed affidavit, demonstrate that plaintiff was notified of many specific reasons for defendant's ultimate conclusions regarding her performance.

Furthermore, there is no requirement that an employer give an employee, particularly a professional employee, objective standards for measuring her performance. Plaintiff was aware that she, at the very least, had to perform in a satisfactory manner to obtain a promotion. Plaintiff admits that criteria for promotion included "performance, potential to perform jobs with more responsibility, potential to hold leadership positions, and overall value to Bellsouth." (Pla.Aff.¶ 63). Defendant was entitled to interpret these criteria to include positive personal relationships with clients and peers, which it legitimately believed plaintiff had not demonstrated.

To be sure, many of defendant's reasons for not promoting plaintiff could be characterized as subjective. However, "[a] subjective reason can constitute a legally sufficient, legitimate, nondiscriminatory reason under the *McDonnell Douglas/Burdine* analysis. Indeed, subjective evaluations of a job candidate are often critical to the decisionmaking process . . . ." *Chapman v. AI Transport,* 229 F.3d 1012, 1033 (11th Cir.2000)(en banc). This is especially the case when supervisory or professional positions are involved. *Chapman,* 229 F.3d at 1033. "Attitude, articulateness, and enthusiasm, as well as appearance, can be

vitally important.... Body language, tone of voice, eye contact, facial expressions and other non-verbal cues significantly affect the impression an applicant makes on the interviewer ...." *Id.* "Traits such as 'common sense, good judgment, originality, ambition, loyalty, and tact' often must be assessed primarily in a subjective fashion, yet they are essential to an individual's success in a supervisory or professional position." *Id.* at 1034 (citation omitted). "It is inconceivable that Congress intended anti-discrimination statutes to deprive an employer of the ability to rely on important criteria in its employment decisions merely because those criteria are only capable of subjective evaluation." *Id.*

Nonetheless, especially when subjective criteria are involved, " 'the defendant's explanation of its legitimate reasons must be clear and reasonably specific' so that 'the plaintiff [will] be afforded a full and fair opportunity to demonstrate pretext.' " *Chapman* at 1034 (quoting *Burdine,* 450 U.S. at 258, 101 S.Ct. 1089). Thus, "[a] subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion." *Id.* Defendant has plainly met this standard.

### 3. *Pretext*

█ Once defendant has successfully rebutted plaintiff's prima facie case, the burden shifts to plaintiff to raise a genuine factual question as to whether defendant's proffered reason for plaintiff's termination is a mere pretext. *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913, 921 (11th Cir.1993). Plaintiff can prove pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089.

Plaintiff attempts to show pretext by disputing defendant's assertions of poor performance. As noted above, plaintiff asserts her good performance, and, by her own testimony, specifically rebuts each of the allegations of poor performance made by her supervisors. In this regard, the instant case is similar to *Holifield v. Reno,* 115 F.3d 1555, 1565 (11th Cir.1997).

In *Holifield,* the plaintiff was a physician at a Federal Correctional Institute. His supervisors noted that he had a poor relationship with the staff and administration, and he was advised in writing of numerous incidents that were considered unacceptable conduct. *Id.* at 1558–59. Holifield specifically rebutted each of his supervisors' allegations, and he believed that he had not been given recognition for instances of good performance. *Id.* at 1559. He argued, similarly to plaintiff Hogan, that his employer, in an effort to conceal its discrimination, had made it appear as if he were the cause of the conflict within his department, when in fact he acted appropriately at all times.

The Court of Appeals for the Eleventh Circuit affirmed the grant of summary judgment in the employer's favor, holding that "[t]he inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance." *Holifield* at 1565. For this reason, when "the employer produces performance reviews ... that demonstrate poor performance, an employee's assertions of his own good performance are insufficient to defeat summary judgment, in the absence of other evidence." *Id. See also Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir.1991) (evidence that employee was fired based on employer's *belief* that he had engaged in misconduct not rebutted by evidence that employee in fact had not done so); *Nix,* 738 F.2d at 1187 ("The employer may fire an em-

ployee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."). As in *Holifield,* the plaintiff in the instant case has not come forward with any evidence demonstrating that the reasons offered by defendant for failing to promote her are pretextual.

Accordingly, summary judgment should be granted with respect to plaintiff's race and sex discrimination claims because she cannot establish a prima facie case of discrimination with respect to her termination from employment, and because she cannot demonstrate that the reasons offered by defendant for failing to promote her are pretextual.

## B. *HOSTILE WORK ENVIRONMENT*

Plaintiff contends that she was subjected to a racially and sexually hostile work environment at BST. Plaintiff's claims of sexual and/or racial harassment are based on the following events: (1) While she worked in the Miami office, one of her fellow attorneys told her that some company employees did not want minorities and women to join the company, and that he did not think that the diversity program efforts were sincere; (2) during a presentation about the company's diversity efforts at a conference in Miami attended by a majority of company attorneys, a couple of attorneys expressed disapproval of the General Counsel's diversity efforts; (3) several employees referred to Morgan as "Chuckles the Clown," which plaintiff believed was because of his diversity efforts; (4) while plaintiff worked in the Miami office, one of her fellow attorneys, at the request of another attorney, refused to cooperate with her on one matter; (5) while in the Atlanta office, newspaper articles concerning the company's diversity efforts were taken off a bulletin board and crumpled up; (6) while she worked in the Atlanta office, a cartoon was posted in the employ-

ee lunchroom showing an older person sitting at a bar ordering a drink alongside two younger employees portrayed as kids who were drinking out of children's "sippy cups"; plaintiff believed that the cartoon made fun of new employees who could not do the work; (7) a fellow attorney told her that he mistakenly thought he saw the BSC General Counsel and plaintiff standing close to one another as if they were having a romantic encounter. (Pl.Dep. pp. 238–242, 278, 280–282, 284–286).

### 1. *Exhaustion of Administrative Remedies*

■ Defendant argues that plaintiff has failed to exhaust her administrative remedies with respect to her Title VII hostile work environment claims. The Court agrees.

It is well established that, before initiation of a Title VII lawsuit, a plaintiff must first file a charge alleging discrimination with the Equal Employment Opportunity Commission ("EEOC") within 180 days after the alleged discrimination occurred. *E.g., Plaisance v. Travelers Ins. Co.,* 880 F.Supp. 798, 806 (N.D.Ga.1994); *see also* 42 U.S.C. §§ 2000e–5(a), (b), (f)(1); *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982); *Jackson v. Seaboard Coast Line Railroad Co.,* 678 F.2d 992, 999–1000 (11th Cir. 1982). The purpose of the charge is to trigger an investigation by the EEOC and, if the claim is found to be meritorious, to further trigger efforts by that agency to eliminate the unlawful employment practice through "informal methods of conference, conciliation, and persuasion." 42 U.S.C. § 2000e–5(b); *see also Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 466 (5th Cir.1970). Generally, all claims pursued in federal court must have been included in the EEOC charge. *Zellars v. Liberty Nat. Life Ins. Co.,* 907 F.Supp.

355, 358 (M.D.Ala.1995)(citing *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974)); *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 929 (11th Cir.1983). The language in the EEOC charge, however, need not mirror the judicial complaint; the "judicial complaint 'may encompass any kind of discrimination like or related to allegations contained in the [EEOC] charge and growing out of such allegation during the pendency of the case before the Commission.'" *Sanchez*, 431 F.2d at 466.

Plaintiff's EEOC charge alleges only the following adverse actions: she was denied a promotion, she was told that she would be subjected to a method of evaluation that was not applied to other attorneys, and she was terminated. (DApx 29). The charge does not mention any of the above-listed events and does not allude to a hostile work environment. The court finds that the EEOC investigation triggered by the charges (*i.e.*, examination of defendant's failure to promote and termination of plaintiff) is very different from what would have occurred if a hostile work environment had been alleged.

Accordingly, because consideration of plaintiff's hostile work environment claim on its merits would undermine the goal of voluntary reconciliation embodied by Title VII, *see Plaisance*, 880 F.Supp. at 806; *Sanchez*, 431 F.2d at 466, the court finds that plaintiff has not exhausted her administrative remedies with respect to her hostile environment claims.

2. *Merits of Hostile Work Environment Claims*

■ Even if plaintiff had properly exhausted her hostile work environment claims and the court could consider their merit, a finding in defendant's favor would be warranted. Title VII prohibits racial harassment that is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir.1982). To determine whether an environment is sufficiently hostile or abusive, the court must look to "all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Title VII is not a federal "civility code." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). " '[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious)" are not sufficient to "amount to discriminatory changes in the 'terms and conditions of [a person's] employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citation omitted).

In this case, the first three events about which plaintiff complains involve comments about the company's diversity program, not comments about plaintiff. The record contains no evidence that the fourth incident, a co-worker's refusal to cooperate with plaintiff, was due to plaintiff's race or sex. The fifth and sixth incidents involve inoffensive neutral materials that were put up on, and taken down from, a bulletin board by unidentified persons for unknown reasons. The seventh incident involves a fellow attorney telling plaintiff that he mistook someone else for plaintiff, which he found amusing. These allegations, even if true, fall far short of the type of severe or pervasive conduct based on race or sex that is necessary to support a finding of a hostile work environment.

## C. *RETALIATION*

■ Finally, plaintiff alleges that her termination was in retaliation for activity protected by Title VII. Title VII prohibits an employer from taking an adverse employment action against an employee in retaliation for that employee's opposition to a discriminatory employment practice. 42 U.S.C. § 2000e–3(a); *Clover v. Total System Services, Inc.,* 176 F.3d 1346, 1350 (11th Cir.1999). The analytical framework set forth in *McDonnell Douglas, supra,* is used to evaluate retaliation claims. *Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913, 919 (11th Cir.1993). To establish a claim, plaintiff must prove that she engaged in protected activity and that she suffered an adverse employment action because of that activity. *See Donnellon v. Fruehauf Corp.,* 794 F.2d 598, 600–601 (11th Cir.1986); *Farley v. Nationwide Mut. Ins.,* 197 F.3d 1322, 1336 (11th Cir. 1999).

Plaintiff alleges that she engaged in protected activity when she complained to Morgan and Brown that the evaluation/mentoring process they had proposed was discriminatory. (Pla.Brf. p. 29). While it is not entirely clear, plaintiff may also intend to allege that she engaged in protected activity when, in September 1999, she told Morgan and Brown that she had been subjected to inappropriate conduct, such as innuendos about a sexual relationship with Morgan, insulting cartoons in the lunch room, the ripping down of articles about diversity, and Sterrett's comment about her culture and not wanting to hire herself and Pita. (*See* Pla. Brf. pp. 29, 31, n. 20; Complaint at ¶¶ 29–30).

For a complaint about discrimination to receive protection under Title VII's antiretaliation provision, an employee "must have a 'good faith, reasonable belief' that

her employer has engaged in unlawful discrimination." *Clover,* 176 F.3d at 1351 (citing *Little v. United Technologies, Carrier Transicold Div.,* 103 F.3d 956, 960 (11th Cir.1997)). "[I]t is not necessary that an employer actually have engaged in an unlawful employment practice; a case of retaliatory discharge can be established if it is shown that the employee simply had 'a reasonable belief that the employer was engaged in unlawful employment practices.'" *E.E.O.C. v. White and Son Enterprises,* 881 F.2d 1006, 1012 n. 5 (11th Cir.1989)(quoting *Payne v. McLemore's Wholesale & Retail Stores,* 654 F.2d 1130, 1140 (5th Cir.1981)); *see also Clover,* 176 F.3d at 1351. Thus, plaintiff must prove both that she subjectively believed discrimination or harassment had occurred and that her "belief, though perhaps mistaken, was objectively reasonable." *Little,* 103 F.3d at 960.

The court has serious doubts as to whether plaintiff had an objectively reasonable belief that defendant had engaged in an unlawful employment practice through either the proposed evaluation/mentoring process or the alleged harassing events. In any event, it is not necessary to rule on this ground. Plaintiff's retaliation claim also fails because a reasonable juror could not find that her termination was causally related to her purportedly protected activity.

First, plaintiff's complaint about the proposed evaluation/mentoring process necessarily came *after* she was asked to participate in that process. This order of events demonstrates that defendant was dissatisfied with her performance *before* she engaged in this protected activity and weakens any inference that might otherwise flow from the fact that she was terminated after she complained.[6] *Cf. Robinson v.*

---

**6.** Plaintiff's testimony that Sterrett expressed his anger with her for her refusal to participate in the evaluation process also undercuts

any claim of retaliation for protected activity. (Pla.Aff.¶ 86).

*AFA Serv. Corp.*, 870 F.Supp. 1077, 1084 (N.D.Ga.1994)(finding absence of causal link, despite termination one day after employer learned of plaintiff's discrimination charge, where plaintiff had been warned numerous times regarding her job performance); *Nelson v. J.C. Penney Co.*, 75 F.3d 343, 346 (8th Cir.), *cert. denied,* 519 U.S. 813, 117 S.Ct. 61, 136 L.Ed.2d 23 (1996)(finding no inference of causation where there was "considerable evidence" that supervisors reprimanded the plaintiff several times and gave him a final warning about his job status before they knew of his discrimination complaints). As plaintiff concedes, the company's management employees told her—*before* they received her complaint about the proposed evaluation/mentoring process—that they would terminate her employment if she did not agree to participate in that process, which is exactly what occurred.

Furthermore, although plaintiff lodged her purported complaint about a hostile work environment before the company proposed the evaluation/mentoring process, a reasonable juror could not find that her termination, which occurred several months later, was causally related to this complaint. The record demonstrates that the company received numerous documented complaints about plaintiff both before and after this event, and that her refusal to participate in the evaluation/mentoring process was an intervening event. *Cf. Gleason v. Mesirow Financial,* 118 F.3d 1134, 1147 (7th Cir.1997) (finding termination only a few weeks after the plaintiff complained insufficient to establish a causal link where discharge closely followed a "significant and costly error"); *Booth v. Birmingham News Co.,* 704 F.Supp. 213, 215–16 (N.D.Ala.1988) (holding that a short span of time created no reasonable inference of retaliation where the record contained "intervening factors," *i.e.,* other reasons for the adverse action

arising after the protected activity), *aff'd without op.,* 864 F.2d 793 (11th Cir.1988).

## IV. CONCLUSION

For the reasons stated, the undersigned **RECOMMENDS** that defendant's Motion for Summary Judgment [Doc. 31] be **GRANTED** and that this action be **DISMISSED with prejudice.** Defendant's Motion to File Expanded Reply Brief [Doc. 52] is **GRANTED nunc pro tunc.**